## Orr *against* Cunningham.

The superintendence and payment of the expenses of the execution of a warrant are presumptive evidence of ownership; but it may be rebutted by proof of the actual ownership, and then the execution of it will enure to the benefit of the real owner.

A title may be lost by abandonment; and if so, it falls back to the State; but is never thereby transferred to an adverse claimant. Nor can a stranger who discovers another's unsatisfied warrant in the hands of the deputy-surveyor, or elsewhere, after any lapse of time from its date, assume the ownership of it, and have it surveyed for himself.

The right to redeem land sold at treasurer's sale is exclusively in the owner: but if actually redeemed by another, it will enure to the benefit of the owner, and vest no title in him who redeems it, although he may have been a claimant of the land at the time.

A defendant in ejectment, who is in actual possession, claiming title by warrant and survey, is not entitled to compensation for improvements made upon the land, by reason of his having purchased a treasurer's title, which he had previously annulled by redemption.

ERROR to the Common Pleas of *Jefferson* county.

Robert Orr against Robert Cunningham and others. This was an action of ejectment for 1030 acres of land. The plaintiff gave in evidence a warrant for 1000 acres of land to John Nicholson, dated the 30th of August 1793, a survey made the 1st of September 1819, and returned 7th of December 1819; and deduced this title by a regular chain down to himself.

The defendants claimed under the same warrant and survey, which they showed was made by Alexander Taylor "for James E. Cooper, in right of John Nicholson," and a patent from the Commonwealth for the land in the survey, dated the 19th of February 1836.

The defendants then gave in evidence a regular assessment of the land, as unseated for the year 1822, in the name of "John Nicholson or James Cooper," and a sale of it by the treasurer, and a deed from him to Samuel Newcomb, dated the 28th of December 1826; and a deed from Samuel Newcomb to James E. Cooper, dated 8th of February 1827, and acknowledged the 18th of September 1839; and a deed from James E. Cooper to the defendants, dated the 22d of May 1839. The defendants then proved that the improvements made upon the land by them were of the value of $3675.

The plaintiff then called William P. Brady, who testified, in substance, that he was the deputy-surveyor for the district in which this land was in 1793; that the warrant was given to him by Thomas Grant, who was the agent of John Nicholson, to be

[Orr v. Cunningham.]

executed; that it remained in his hands unexecuted until 1802, when Thomas Grant and Henry Vanderslice called upon him, and Vanderslice, who was then sheriff of Northumberland county, said he wanted to levy on the warrant; he did levy on it, and took it away. About six months afterwards, Thomas Grant returned the warrant to him, and it remained in his possession until the year 1819, when he transferred it to James E. Cooper, without any authority, and handed it over to Alexander Taylor, who was his successor, as deputy-surveyer of the district. On his cross-examination he said, that there were a number of other warrants handed to him to be executed, in 1793, by Thomas Grant, at the same time with the one in question, and that Grant was interested in some of them but not this one.

The plaintiff then gave in evidence the treasurer's sale-book of Jefferson county, showing the sale of the land to Samuel Newcomb, and the redemption of it on the 3d of October 1827 by James E. Cooper; and then called Samuel Newcomb as a witness, who testified: " The same fall I purchased, or sometime that winter, I met with Mr Cooper. He spoke to me about this land; said Mr Brady had told him I had purchased it at treasurer's sale; he wanted a line from me to the treasurer that I had received my pay. I owed Mr Cooper a couple of dollars that was deducted out, and I gave him a line to the treasurer to receive the remainder. We had some talk about the deed; he considered it of no value, but said it was to be his property. I considered the deed of no value to me but what it cost me. A short time after, he wanted me to send the deed or leave it at Esquire Bell's. It was not sent, and lay in my possession till 1839, or the beginning of 1840, when he received the deed from me, with the transfer that is now on it; and made me satisfaction for the same. It was made at the date of the acknowledgment, but I had agreed to let him have the deed long before, in 1827. The treasurer paid over the money to me according to the line I had given Mr Cooper; the account was deducted out and the treasurer paid me the balance. It was agreed that we would date the transfer about the time that I had agreed to give him the deed. It was written and executed the day it was acknowledged before Judge Winslow. It was not mentioned at our first conversation that I was to convey. It was afterwards that we talked of the deed, at the second conversation. I agreed to transfer the deed to him; he gave me the price of the deed, and a dress for my wife. I did not consider I had received the amount before. The reason I did not leave the deed at Esquire Bell's was, because I did not consider I had been paid all out, and wished to give it to himself so I could get the balance."

The court below charged the jury that the time which had elapsed between the date of the warrant and the survey for Cooper, without any intervening act in prosecution of the title by the warrantee, raised a presumption that the warrant was Cooper's

property when the survey was made for him; and that this presumption was not rebutted by the facts proved by William P. Brady, the deputy-surveyor. That whether the treasurer's title was conveyed to Cooper, was a matter of fact to be determined by the jury; and that upon that fact depended the question whether the defendants were entitled to compensation for their improvements. The jury found a verdict for the defendants.

*Buffington,* for plaintiff in error, argued that Cooper never acquired any valid title to the warrant; the testimony showed conclusively that the original title of the warrantee was vested in the plaintiff. The survey in 1819 enured to the benefit of the owner of the warrant. The sale by the treasurer was annulled by the redemption; for although Cooper had not such title as would enable him to redeem, yet if he did redeem the land in fact, and the purchaser agreed to it by receiving the redemption money, it is binding upon him, and defeats his title. His subsequent conveyance of his title was a nullity. 10 *Peters* 1; 9 *Watts* 98.

*Foster, contra,* contended that he who superintended and paid the expenses of locating a warrant, was presumed to be the owner of it. Besides, the great lapse of time from the date of the warrant to the time of its location, justified the court in referring the question to the jury, whether he had not purchased the warrant; especially when it was proved that it was delivered to William P. Brady a long time after he went out of office, and consequently, not for the purpose of having it executed. 2 *Binn.* 55; 1 *Yeates* 164; 2 *Yeates* 318; 17 *Serg. & Rawle* 350. But if Cooper was not the owner of the warrant, he had no right to redeem, and consequently the title remained in the purchaser at sheriff's sale, which was sufficient to defeat the plaintiff's action. 2 *Watts* 436. Cooper was the purchaser of the treasurer's title.

The opinion of the Court was delivered by

GIBSON, C. J.—It is not alleged that the defendants are entitled by the Statute of Limitations; but the court charged that the time which had run between the date of the warrant and the survey for Cooper, without an intervening act in prosecution of the title by the warrantee, raised a presumption that the warrant was Cooper's property when the survey was made for him; and that this presumption was not rebutted by the facts sworn to by Brady, the deputy-surveyor.

To state those facts, is to decide the point. The warrant was issued to Nicholson, in 1793; the survey was made on it at the instance of Cooper, in 1819; and as superintendence, with payment of fees, has been deemed presumptive evidence of ownership, there was perhaps a legal presumption that Nicholson was, from the first, a trustee for Cooper. But the survey raised no presump-

tion of a conveyance from Nicholson, granting him to have been the owner of the warrant in the first instance. In *Galloway* v. *Ogle*, (2 *Binn.* 463), a claim set up to a warrant and survey in the name of another, and persisted in without contradiction for 30 years, was held, in the absence of a transfer by the warrantee to any one else, to be presumptive evidence that his title was vested in the claimant by a deed since lost. In the present case, Cooper's claim was set up in 1819, and had been persisted in at the suing out of the writ in 1839, for less than 21 years. The time necessary to raise a presumption which acts on an interest in land, has been eventually reduced to the standard of the Statute of Limitations; and measured even by that, the time in this instance would be too short. Length of time, however, is not indispensable to the presumption of a trust; and the survey procured by Cooper at his own expense, raised a presumption, in the first instance, that he was the original owner of the warrant. But this presumption, though a legal one, and such as a jury is bound to entertain, was open to disproof; and what did Brady, the deputy-surveyor, testify in respect to it? He stated that this warrant and several others, were put into his hands for location, by John Barron, in the presence of Thomas Grant, who was interested in the warrants with Morris and Nicholson, but who ceased to have an interest in this particular one when they came to be divided. It was delivered to him in 1793, and remained unexecuted in his office till 1799, when he was superseded; and, though an official paper, it was not handed over to his successor. It was, with others, demanded by the sheriff of Northumberland county, in 1802; subjected to the form of a levy and sale on execution; and handed back to the witness—a proceeding which was declared by this court, on another occasion, to have been utterly void. The warrant then remained in the custody of the witness till 1819, when he sold it to Cooper, without colour of right in himself or pretence of authority from another. What then becomes of the presumption of Cooper's ownership? A warrant is not an article of merchandise; neither have we market overt for it. Brady's want of title appeared on the face of the instrument, which was notoriously an office paper; and it is a familiar principle, that the purchaser of an imperfect title must stand or fall by the case of him from whom he had it. Yet the court charged that the facts did not rebut the presumption of Cooper's ownership.

How then can the title have passed from the warrantee and those beneficially interested with him? By abandonment, say the defendants, for forty years. A title may certainly be lost by abandonment; but this is the first time we have heard it suggested that it may at the same time be *transferred* to an adverse claimant, or picked up by the first person who finds it. It falls back to the State, and, by its extinction, sometimes makes a younger, but conflicting title, good; but here there was no such conflict, for both

[Orr v. Cunningham.]

parties claim in the same right, and the point is to determine which of them is the owner of it. Where there is no race for priority of appropriation, an owner may suffer his warrant to rest unexecuted in the office of the deputy-surveyor, without prejudice, for an indefinite time; and even where there is such a race, he forfeits no more by delay than his right to be served before his juniors. His loss of priority may doubtless cost him the land, but not his warrant; for the contest in such a case is between the owners of separate titles, neither of whom can appropriate his adversary's title to himself. Nor can a stranger who discovers another's unsatisfied warrant in the hands of a deputy-surveyor, assume the ownership of it, and have it surveyed for himself. How great soever the supineness of the warrantee, it can be taken advantage of only by the State or its grantee, and not by an intermeddler. In this case the survey, being a lawful act, was not void; and it necessarily enured to the owners of the warrant.

We have before us, then, the case of a warrant put into the hands of the deputy-surveyor in 1793, without further prosecution of the title till 1819; an unauthorized sale of the warrant, and a survey for the purchaser in that year. This is the case presented by the record; and the most dexterous manipulation of it must fail to work it into the effigy of a title in the surreptitious purchaser.

The subsequent sale for taxes would have transferred the right, had not the land been redeemed. But the act of redemption is impugned on the ground that Cooper had no right to perform it; and the argument presents this dilemma: if he was not the owner, it is said, redemption by him was void, and the tax sale stands good; but if he was in fact the owner, the plaintiff has no right to recover.

The right to redeem was given exclusively to the owner of the land when it was sold, to guard the purchaser from the officiousness of strangers; but when the purchaser himself has ratified an unauthorized act of redemption, who can be admitted to object to it? Certainly not the person who performed it. The party for whose protection the provision was intended, may waive the benefit of it when he thinks proper. Cooper doubtless did not consider himself a stranger, nor did he mean to redeem for the advantage of any one but himself; yet he could not assign to the act less effect than the law gave it. The decisions have gone on the letter of the statute, that a tender by one who has not an interest in the land, may be rejected; but here it was accepted. It is proper that the act of an intermeddler should not be suffered to devest a title; but where the purchaser elects to take what the law allows him, either from a friend or an antagonist of the owner, it would be a fraud in him afterwards to dispute it. Here he does not dispute it. His purchase is claimed under the very person who paid the taxes and costs into the treasury expressly to defeat it. Had there been a surplus bond, it would have been cancelled or deli-

[Orr v. Cunningham.]

vered up, and the treasurer's deed would, beyond dispute, have been avoided; yet this effect would have been produced by the intervention of one who was neither owner nor agent, but an antagonist claimant; and there cannot be one rule where there has been a surplus bond, and another where there has been none. Why should not such a claimant be allowed to redeem for the party eventually entitled, even without the concurrence of the purchaser? It is not the business of the treasurer to determine between conflicting pretensions to the right; and where he has received the tender of the one claimant, what is the other to do? He also may doubtless tender; but as the treasurer has no authority to receive, in the whole, more than the taxes and costs with the additional twenty-five per cent., it would be nugatory to go through the form of a tender that would be inevitably rejected. *Lex neminem cogit ad vana seu inutilia.* On the principle by which a patent enures to him who has the right, I would say that a tender by either of two adverse claimants might enure to the true owner, even without acceptance of it; but where the money is taken, and the purchase given up, there cannot be a doubt that the parties are remitted to their former rights.

This principle disposes also of the claim of compensation for improvements. The defendants appear, not in the place of a purchaser at the treasurer's sale, but as claimants of a title paramount, under one by whom the sale was annulled. If the title by the sale were still in force, they would have a right, not to compensation for improvements, but to the improvements themselves. It was a blunder in Cooper to avoid the deed instead of leaving it in force and taking an assignment of it; for had he given the transaction the form of a purchase from the treasurer's vendee, he would have had the plaintiff's title in addition to his own. The matter seemed at first susceptible of that construction; but all its features except the assignment, appear, on closer examination, to be decisively those of redemption. The payment of the money into the treasury, and the memorandum of tender on the list of sales, indicate the true nature of the transaction too clearly to let it pass for a purchase. The object of consulting the vendee at all, seems to have been no other than to obtain his consent to a deduction of his debt to Cooper from the redemption money. Cooper considered the treasurer's deed so worthless, that he did not desire at first to have it delivered up; and though he afterwards insisted on it, the assignment of it operated no further than to transfer an exploded assurance. By giving the transaction that shape, he rejected the healing influence of a tax sale; and though we regret to see parties deprived of the fruit of their labour by an oversight, we dare not protect them at the sacrifice of a principle.

Judgment reversed, and a *venire facias de novo* awarded.